IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Amit Patel, a former shareholder of | ) | |
| Devesh, Inc., a dissolved Illinois | ) | |
| corporation, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:16-cv-10497 |
| | ) | |
| -vs- | ) | Judge Charles R. Norgle, Sr. |
| | ) | |
| CBRE, Inc., a Delaware Corporation | ) | Magistrate Judge Shelia Finnegan |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

### JURY TRIAL DEMANDED

Plaintiff Amit Patel, a former shareholder of Devesh, Inc., *pro se*, in support of his Complaint against Defendant CBRE, Inc., states and alleges as follows:

### Parties

1.      Amit Patel, a resident of Cook County, was the sole former shareholder of Devesh, Inc., a dissolved Illinois corporation whose principal place of business was in Cook County in the State of Illinois (collectively Amit Patel and Devesh, Inc. hereinafter referred as "Devesh").

2.      In accordance with 810 ILCS 5/12.30(4), after dissolution of Devesh, Inc., Devesh, Inc. distributed its remaining assets to its sole shareholder, Amit Patel.

3.      Defendant CBRE, Inc. is a Delaware corporation authorized to conduct business in the State of Illinois, whose office is located in Cook County in the State of Illinois.

1

4.      Kim McGuire has been the Senior Vice President of Retail Services Group of Defendant CBRE, Inc. since March of 2008 (collectively Kim McGuire and Defendant CBRE, Inc. hereinafter referred as "CBRE").

## Jurisdiction and Venue

5.      The Court may have subject matter jurisdiction of this action under 28 U.S.C. § 1332(a) (1).

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) (2) because a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district.

## Facts

### Lease

7.      On April 22, 2010, Devesh entered into a written lease agreement (the "Lease") with 55 East Monroe Investors IV, LLC (the "landlord"). The Lease was for Devesh to rent 1,931 square foot of commercial space to establish its Seattle's Best Coffee shop at 55 East Monroe Street in Chicago.

8.      In connection with the Lease negotiations, the landlord was represented by CBRE.

9.      On April 23, 2010 the landlord provided CBRE a copy of the executed Lease.

10.     The Lease became effective in October 2010 with an initial term of 10 years with options to extend the lease for additional 10 years. The base rent for the first 60 months was $25 per square foot and $28.75 per square foot for months 61 through 120.

11.     The Lease required Devesh to operate only as Seattle's Best Coffee in the space, but permitted Devesh to sublet the space to other tenants.

2

12.     The Lease further provided that in the event of a sublet, Devesh would be entitled to profit from subleasing.

## Devesh seeks to Sublease

13.     On August 9, 2011 Devesh requested a meeting with Steven Smith ("Mr. Smith"), the landlord's representative, to inform the landlord of Devesh's intent to sublet.

14.     At the meeting Devesh also intended to find out precisely how to provide notice to the landlord, along with inquiring as to whether or not the landlord would exercise the right to terminate the Lease in the event Devesh sublets.

15.     On August 16, 2011, Devesh met with Mr. Smith and at the meeting Mr. Smith informed Devesh that a written notice to sublease was not required, and the verbal notice provided by Devesh sufficed.

16.     During the August 16, 2011 meeting, Mr. Smith further stated that although he believed that the landlord would not exercise the right recapture the space if Devesh sublet, he would confirm this belief form the landlord's managing members.

17.     Mr. Smith's representation to Devesh that written notice was not required constitutes a waiver of the written notice provision in the Lease.

18.     The Lease provided that upon Devesh's notice to sublet, the landlord had an option to terminate the Lease and recapture the space.

19.     The Lease further provided that if the landlord exercises the right to recapture the space and terminate the Lease, the landlord must do so within 45 days of receiving Devesh's notice.

20.     On August 24, 2011, Mr. Smith confirmed to Devesh that the landlord will not exercise the right to recapture the space and terminate the Lease if Devesh sublet.

21.     The landlord had never notified Devesh that he was exercising the right to recapture the space after receiving Devesh's notice to sublet.

## CBRE Embarks on Soliciting Tenants for Devesh's Space

22.     On August 16, 2011 Mr. Smith informed CBRE that Devesh was looking to sublease his space as his business was not doing well.

23.     Immediately after Mr. Smith contacted CBRE, CBRE began soliciting tenants for Devesh's space.

24.     On August 16, 2011 CBRE solicited Caribou Coffee Company ("Caribou") and Geoff Alexander of Lettuce Entertain You for Devesh's space.

25.     Between August 16, 2011 and September 7, 2011 CBRE solicited Protein Bar for Devesh's space.

26.     Protein Bar, Caribou, and Geoff Alexander were clients of Defendant CBRE, Inc.

27.     Protein Bar and Caribou were being represented by Daniel Jacobson of Defendant CBRE, Inc.

28.     CBRE only marketed Devesh's space to his clients on hopes that those clients would keep the solicitation confidential, as Devesh's space was "under a lease".

29.     In each solicitations and marketing, CBRE in fact advertised Devesh's space as being available, along with asking a base rent of $50 per square foot.

30.     In soliciting clients for Devesh's space, CBRE informed his clients that a soon to be established Starbucks' outlet close-by to Devesh would be the "final straw" for Devesh, as Devesh's coffee shop was not doing so well.

31.     CBRE's solicitation of Protein Bar and Caribou was successful, in that both Protein Bar and Caribou submitted offers to lease Devesh's space.

32.    CBRE had foreseen that if CBRE finds a replacement tenant for Devesh's space, than the landlord would let Devesh out of the Lease. In fact, CBRE had informed his clients of such outcome as early as August 16, 2011.

33.    CBRE was fully aware that the Lease did not allow the landlord the right to solicit tenants during the pendency of the Lease.

34.    CBRE also knew that if Devesh sublet the space CBRE would not receive any commissions.

35.    CBRE had never contacted Devesh to seek approval or authorization to market Devesh's space.

36.    Devesh had never authorized CBRE to solicit tenants for his space.

37.    CBRE knew that to earn commissions, CBRE would have to persuade the landlord to no allow Devesh to sublease the space.

**Real Estate License Act of 2000**

38.    Pursuant to Real Estate License Act of 2000 ("RELA") all exclusive listing agreements must be in writing and must have a definite expiration date. CBRE's exclusive listing agreement with the landlord dated December 31, 2008 expired on January 31, 2010.

39.    In October 2011, the landlord and CBRE entered into an agreement amending the expired listing agreement. The listing agreement did not encompass finding tenants for spaces that were already leased. CBRE knew that the listing agreement did not cover subleases.

**Inducing Caribou**

40.     In an effort to persuade Caribou, CBRE resorted to disclosing confidential sales information of clients who were operating food outlets close to Devesh's space. Caribou would have been a direct competitor with some of those clients.

41.     On information and belief CBRE was not authorized by the rightful owners to disclose their confidential sales information to attract a competing Caribou outlet for the benefit of Caribou, CBRE, or the landlord.

42.     After exchanges of offers, on September 29, 2011 CBRE countered Caribou's offer concerning leasing Devesh's space. CBRE emailed the landlord a copy of the counter offer that was submitted to Caribou.

43.     The offer represented a base rent of over $900,000 over the term of the lease, resulting in more than $400,000 in base rent over what the landlord would have derived from Devesh's existing Lease.

44.     Based on the offer CBRE stood to earn total commissions of about $46,000.

45.     Shortly after the counter offer was submitted to Caribou, CBRE sent a follow up email to the landlord, attaching parts of the subleasing provisions from Devesh's Lease. CBRE intended to persuade the landlord to not allow Devesh to sublease.

46.     Immediately after CBRE's email, the landlord told CBRE that he would not let Devesh sublease, directing CBRE to have a meeting with Devesh to see if Devesh would go "peacefully."

**CBRE's Step Beyond**

47.     Consistent with the landlord's directive, a meeting for October 7, 2011 was initiated by CBRE. CBRE misrepresented the purpose of the meeting to Devesh, informing Devesh

6

that the purpose was to find out what Devesh intends to do with the space. CBRE's true

purpose for the meeting was to see if Devesh will leave peacefully.

48.     During the October 7, 2011 meeting CBRE told Devesh that the landlord's lender

would not allow Devesh to profit from subleasing. However, CBRE had never spoken with

the landlord's lender, or even knew the identity of the landlord's lender. CBRE's intent was

to have Devesh surrender the space.

49.     CBRE's statement was designed to intimidate Devesh by foreclosing Devesh's

possibility to sublease on the account of the landlord's "lender". CBRE intent was to have

Devesh surrender the space.

50.     Immediately after the meeting CBRE emailed the landlord transcribing what occurred

at the meeting, noting that Devesh left "quietly" and "didn't argue".

**Landlord's Breach**

51.     Since the landlord confirmed that he would not recapture the space or terminate the

Lease if Devesh sublet, Devesh presented several tenants to the landlord. The landlord did

not approve any of the proposed tenants, and finally a year later, on August 31, 2012 Devesh

surrendered his space to the landlord.

52.     The landlord did not allow Devesh to sublet, or exercised the right to terminate the

Lease, as the landlord did not want to release Devesh from the Lease obligations, until a

replacement tenant was fully secured.

53.     The Lease, however, did not provide the landlord the right to secure a replacement

tenant prior to exercising its right to recapture/terminate the Lease.

54.     As of August 31, 2012, Devesh had fully performed his obligations under the Lease;

i.e. was current on rent payments and had not otherwise violated any terms of the Lease.

55.     If Devesh was allowed to sublease (i.e. become sub-landlord), Devesh would have realized a base rent of over $695,160 plus CAM and Taxes over the initial term of the Lease.

## Count I – Tortious Interference with the Lease

56.     Plaintiff re-alleges the allegations of paragraphs 1 to 55 as paragraph 56.

57.     The Lease between Devesh and the landlord was valid and enforceable.

58.     Defendant CBRE had knowledge of the Lease, including possession of an executed copy of the Lease as of April 23, 2010.

59.     Defendant intentionally and unjustifiably induced the landlord to breach the Lease for their sole personal monetary gain as set forth in above paragraphs.

60.     The landlord breached the Lease as a direct result of Defendant's wrongful conduct as set forth in above paragraphs.

61.     Devesh was injured by an amount to be proved at trial.


        WHEREFORE, Plaintiff prays for a judgment against Defendant CBRE, Inc. in an amount to be determined at trial, along with all other remedies and damages permitted and allowed under the Law for the Defendant's conduct.

                                        Respectfully submitted:

                                        _____/s/Amit Patel_____
                                          Amit Patel, *pro se*

Amit Patel
12821 S. Division Street
Blue Island, IL 60406
(708) 969-4894